Please be seated. Our next case is Jason Gold, Trustee v. First Tennessee Bank National Association. Mr. Ostreicher, is that correct? Yes, Your Honor. All right, sir. May it please the Court, Kenneth Ostreicher for the appellant, H. Jason Gold, the liquidating trustee. This case involves a massive fraud scheme by a mortgage banker whose scheme caused losses of at least $33 million and up to $150 million. And the trustee's attempts to recover transfers are made in furtherance of that scheme as fraudulent transfers. The Bankruptcy Court decision dismissing the trustee's complaint and the District Court opinion affirming that decision should be reversed primarily for two reasons. First, the Bankruptcy Court erred in holding that First Tennessee Bank who is defended here, established that it was entitled to the good faith defense under 548C of the Bankruptcy Code that received the transfers in good faith and for value because First Tennessee Bank presented no evidence of relevant industry standards and norms which relate and are required by the good faith standard. Okay, now, Mr. Ostreicher, do you agree that that's a clearly erroneous standard of review in this Court on the issue of good faith? I believe there are factual issues that are determined as a clearly, under the clearly erroneous standard as to good faith is primarily a factual issue. There are some legal principles that interplay with that because when you deal with the objective standard, the question is whether the evidence that was presented was evidence of objective belief or whether it was subjective. The trustee was arguing pretty clearly in the Bankruptcy Court and also in the District Court that expert testimony was required to establish that objective component. Isn't that correct? But I don't see it in your briefs that there had to be expert testimony. Have you abandoned that argument on appeal? Well, let me say this. It was never the argument made that that was necessary for the Bank. You're saying you didn't make that argument in front of Judge Mayer? No. No, we never did. And it's kind of interesting that it winds up in both opinions. What we said was that you needed evidence of industry norms and practices. And they could not be supplied by bank employees. Well, if the bank employees were allowed to testify as experts or go beyond what their factual knowledges of what their practices were, there'd be some evidence. But what was presented at trial did not include any evidence of what industry norms and practices were with respect to the relevant issues here. Now, there was testimony at trial by the bank witnesses as to practices involved in screening mortgagors, I mean potential mortgage bankers. There was evidence about how they screen individual loans. There was evidence presented by the testimony as to conditions in the market in 2007. But there was no evidence whatsoever as to what a reasonably prudent warehouse lender would do when confronted with the red flag issue. Well, then that's expert testimony, what a reasonably prudent warehouse lender would do. Well, obviously. Okay, obviously. I'm asking you, is your argument today that they had to have an expert witness? Well, it's not, I don't... Well, that's a yes or no. Are you arguing that today, that the bank was required to have an expert witness? No, I'm not arguing that. I'm arguing they had to have evidence. Well, you put it in footnote 9. In footnote 9, you've got it there. It says that they likely needed to produce an expert witness. Likely. You said you never argued it, but you say they likely needed to produce one. Correct. I mean, I'm saying... Look, if I'm a party with the burden of proof to show that I acted in a manner that any reasonably prudent warehouse lender would do when confronted with these issues of delays and other problems, I have to show that the industry standard is, slough those off, not pay attention, they don't indicate to me any possibility of fraud. And we said, how would you normally do that? You normally would do that likely through an expert witness who could testify like in other cases we had. But didn't you stipulate you didn't need one? Wasn't there some stipulation to that effect? What we agreed to was that the experts, the parties, the way the pre-trial order had worked, we designated an expert, even though it was not our burden to do that. First Tennessee Bank did not designate an expert, unlike other defendants in these cases. First Tennessee then moved to a motion in limine to disqualify our expert. And then rather than litigate that, we said, well, it's their burden to show under 548C what the industry norms and practices are. If they don't have an expert, there's no point in us fighting with them to have an expert to rebut their expert when they have no expert to show what the industry norms and standards are in the first place. Why didn't you, it seems to me, this is a fact complicated type case in which you've got this huge record. Why didn't you just make a chart of everything and lay out these red flags over here? You've probably seen in litigation done all the time. Put over here all the evidence that says it's subjective and then put over here what looks like there's nothing to suggest is subjective and point that out to the judges. Okay, judge, fill in that box right there. Tell me what is the objective evidence that you say fits in that box. I mean, it's either there or not. It looks like a complicated case, but it's not complicated when you do what you do in real estate. It is lay it down on the ground and look at what is actually there in the transcript. Why didn't you make it simple? What we tried to do in our briefs is to point out the evidence of red flags, and we put into the record at trial the evidence of the red flags. Right, but Judge Mayer accounted for those, and he said that he was reviewing the testimony of Mr. Garrett and Mr. Daugherty and that he had factored into his assessment of their credibility and reliability the fact that they were bank employees. And he held, nonetheless, that because of the short period of time this line was open for, what, only three months or so, from July to October, that because of all the changes that were going on in the mortgage industry at the time that there was testimony that several other banks had handled, that there had been payments made to cover deficiencies, hoping that the market would turn around. Judge Mayer cited a lot of different things and said that he accepted good faith. So how do you get around that today? You haven't made the argument that you had to have expert testimony. So how do you get around Judge Mayer's, what I think you can only call a very carefully considered opinion of evaluating this testimony? What's wrong with Judge Mayer's decision here? And point us to parts of his opinion that you think are flawed, because it seems pretty comprehensive to me. Well, you need to understand the record and what Judge Mayer said in the record about the qualifications of Mr. Garrett and Mr. Dougherty. The problem we have is that if someone, as Judge Mayer said, there was evidence of how their practices, FTB's practice, compared with the industry standard. But there is nothing in the record. I mean, it's hard for me to do anything other than to tell you to go back and look at the testimony and say you will not find the testimony. But as an appellant, you have to be able to tell us what's wrong with the trial judge's opinion. That's all I'm asking you. What's wrong with his opinion? Our basic problem with the opinion is that it is based entirely on subjective beliefs of the First Tennessee Banks with respect to the issue that's involved. But that's not what Judge Mayer says on page 23. He's citing to the fact that the testimony that says that, I guess, is this Mr. Garrett? He's saying that he monitors industry publications. I receive email. I go over these compilations of what people in our industry are doing. I might go to the Wall Street Journal, the Mortgage Bankers Association publication, or Fannie Mae publication. There is testimony in this record that these people, these witnesses for the bank, looked at what industry practices were. Well, yes, I don't, and we never disputed that they were familiar with industry practices with respect to approval. So what made their testimony purely subjective from your perspective, other than the fact they were bank employees? The issue that we were addressing is whether they objectively or subjectively believe that the evidence of red flags put them on inquiry notice of fraud. When it comes to that issue, again, we're not talking about what Mr. Garrett was testifying about, looking at newsletters online every day or the mortgage track system that he developed, or the fact that they screened Tenasia very carefully before they accepted him in the program. And that's not the issue. The issue is you're dealing with an industry that's in transition or having a difficult time in 2007, and you're confronted with factors, evidence, which was in the record of failure to provide documents, failure to provide promissory notes, failure to sell loans off the line, an unusual excuse for failure to do so, buying loans by the investor, by the mortgage banker rather than by investors. And this confrontation they had in Tenasia's office in January in which he even asked them, well, these are fraudulent loans. David, Goodyear heard all that, and he said that he accepted the good faith defense. Now, what about his analysis is wrong? You've got to show that it was clearly erroneous, so tell us why. The analysis is... requires an objective good faith. So you're saying there has to be somebody other than a witness from the bank testifying? Well, a witness from the bank could be qualified to testify about industry standards beyond First Tennessee Bank, but that's not what happened here. There was no testimony whether they could have or should have or might have or whether you need an expert or not. The answer is there was none. So if there's no testimony as to what the industry would do when confronted with this information, then you don't have any measuring stick to measure against what... So you're saying there had to be an expert witness, someone who could render expert testimony. What you're talking about is expert testimony, what the industry standards are. Yes, I mean, yes, I would say that could come out and it doesn't have to be an expert. But you're not really saying in your brief that. You're not saying it at all, except for apparently this footnote where you say likely you needed to produce an expert. If that's the crux of your argument, that you need an expert to testify to industry standards, why don't we see this in your brief? Well, because the argument is a little... a slightly different argument than what Your Honor has premised. What we're saying is you have to have... We didn't call it... We didn't say... We said you had to have... And what I'm saying to you now, you needed some evidence of the industry norms. I don't... I mean, it doesn't matter to me or it shouldn't matter to any court as to whether it comes in through an expert or some other means, although I can't imagine... But there was testimony here about the industry norms. Mr. Garrett and Mr. Daugherty testified to that. Judge Keenan read some of those quotes earlier and you agreed that that's what they talked about. Yes, I mean, the industry is... Look, Mr. Garrett, in testimony, had a long introduction about his background, the type of work he does, and obviously I was prepared at trial to address those points where he went beyond what First Tennessee did and actually started talking about industry standards beyond what he knows at First Tennessee. He's been at Tennessee for 14 years. He knows what First Tennessee does and he keeps up with the business. I never denied that he... that he is an intelligent man who follows the industry. What I'm saying is that you did not have any evidence as to what the industry norms would do. Would it be reasonable for a reasonably prudent mortgage lender to simply let $12 million sit there for a month and a half based on the excuse that my envelope stuffer or my assistant who sends more documents went off to Honduras and didn't come back? Okay, I agree. Well, the judge, mayor believed that that's... that they believed that, that Mr. Garrett and Mr. Darity believed that was an excuse. I'm saying, where's the evidence that that's reasonable? So what makes your case and your argument so difficult, police attorneys, to deal with this is go back to had a chart been made or at least some type of indication because when you try to lump all those flags together and then you take the judge's general state... well, Mr. Garrett and Mr. Darity, both of whom are employees with the bank involved in this, get up and give a testimony. They're not experts. The judge says they're not qualified as experts. But what would make your case a simpler case if you take each one of those flags and one of them is that conversation they had with the lawyer about whether these loans were fraudulent and the lawyer said, oh, no, they're not fraudulent. Well, that's what they said. But where's the evidence? This is where you ought to be going. Where's the evidence that that's the customary practice, that once they tell you that, that's what you do? That's the... I understand you want to go there, but when you sit down, you ought to think about it in terms of, stop trying to do this thing with all of them lumped together. Some of them may in fact have some evidence that you could infer that there's a customary way of doing it. But when you parcel them out and look at it and say, okay, what is the testimony? How did you react to that, Mr. Daugherty and Mr. Garrett? You are from... And this lawyer tells you there's no fraudulent. You've got something going on in your head to ask that. They tell you what they did. And then you ask the question, well, where is the evidence of the customary practice? Then you've got something. But if you keep arguing this thing that it's all together and the judge said it was all generally good and he said that they had qualifications, you're lumping them together. That's where the chart, the breaking down, just seems to make sense. It makes it simple, I think. It could be. I mean, it might have been a different approach that we would have taken with this. I mean, our position has always been, and the law is clear, that the burden that you talked about is on the part of the bank, not us. We don't have to prove that what they did was reasonable. They have to prove that it was reasonable. I don't have to prove it's not reasonable. The judge found that the First Tennessee Board of Burden of Proof only has good faith defense. He said that, but that's not what happened at the trial. Then he comes up and he then uses Garrett's testimony as a basis upon which to say he has all this experience. He's been to seminars. He's done all kinds of stuff here. He knows the practices, and here it is. And if you lump it like that, it flows. The problem you will get in and how your case can be made, in my opinion, is maybe he did for some of these things. Maybe, for instance, he was able to tell why they weren't able to sell the $12 million in loans, because he's dealing with the industry practice. But when you get to specific stuff, like the failure to provide the opening packages and things like that, then you get into being able to say, okay, here's no evidence of this. But if you lump it all together, it becomes confusing, at least from my perspective, because then you just seem to feel like, well, you can testify about anything you want. But he's not an expert now. I realize I'm running into my rebuttal time, and I'm a little concerned about saving some time for rebuttal. But the point is that the objective standard, the inquiry notice, which is the target that you look at, at some point along the line that you mentioned, you cross that line and you're on inquiry notice. But the burden of showing we're not on inquiry notice when faced with this is on the other side. And I'm always saying, you mentioned the point there, it's a continuum. For example, if there's a delay in delivering notes and collateral documents, that's an issue. It's in violation of the agreement. And if the investors are returning notes, well, that's not good either because it shows there's something wrong with the system. You're not selling the loans, that's the basic purpose of our agreement, and you're not giving me a good reason for not selling the notes. What the law requires is that you then look into that, okay, and to see where that leads you. And in this case, it would have led right to the fraud. The initial stage is whether the law says an objectively prudent lender would have looked more, done the investigation, looked at the files, talked to some of the borrowers, looked for recordings, done something to have followed up on these things that may be possible indications of fraud. And without the industry norm to compare that to, you don't know whether Mr. Garrett and Mr. Debb, we know what they said about FTB's practice and what their beliefs were, but there's no evidence there of what the reasonable standard would be. I know the judge said, look, that's why we're appealing the decision. Did you want to give up all your rebuttal time? No, I don't. Okay, I don't want to interrupt you, but I hate to see that happen. I can tell you that time was well spent, regardless of how you rebut. That was a pretty good time right there. Thank you, Your Honor. Okay, Mr. Wilbin. Clarence Wilbin, First Tennessee Bank. Your Honors, as I have briefed this appeal and dealt with the issues before the court, there's only one thing that keeps coming up and comes to my mind, and that is the appellant hasn't shown anything that Judge Mayer did wrong or that he was clearly erroneous other than they don't like the outcome. They don't like the result. So what they've done is come here and ask Your Honors to change this, substitute what we believe, we the trustee believe, is correct for what Judge Mayer did. I guess Mr. Ostrich, though, is saying the testimony was inherently subjective, and he's saying not simply because they're bank employees, but because they didn't testify enough as to what was going on in the industry. Could you address that? Yes, ma'am, Your Honor. He's saying that they didn't testify enough to satisfy Mr. Ostrich. The trier fact in this case was Judge Mayer, and Judge Mayer looked at this and he considered all the evidence, and actually, in his opinion, Judge Mayer identified and I think astutely pointed out that Mr. Garrett actually could qualify as an industry expert. We didn't move to qualify him because it wasn't required for him to be an industry expert to provide the testimony that he did. But as he pointed out, he created the software that's used in the industry. Mr. Garrett also testified that he's called upon to sit on the panels and be at seminars, not to attend seminars to learn, but to come to seminars and teach. So I think, Your Honor, he did testify enough. Now, to the extent that Mr. Ostrich wanted more and thought there were more specifics that he wanted to hear from Mr. Garrett or Mr. Daughtry, he was there. He cross-examined both of these gentlemen. If it was enough for the court, the bank met its burden. If Mr. Ostrich wanted more and not Judge Mayer, he should have asked more questions. Is that because the court has some level of expertise and knows something? Maybe they understand the industry practice? I mean, where does it come from? It either comes from Garrett and Daughtry, particularly Daughtry, and particularly look at this business about questioning where the lawyer is involved and they ask the question, is there fraud involved here? And the response, of course, from the lawyer who's representing the debtor here is, oh, no, no fraud. And then what I have concerns at that point is there's clear evidence of their subjective actions because they tell what they did, but I'm having trouble finding out where does the judge find the customary practice for when you are dealing with that level of suspicion, that you would ask the lawyer, is there some fraud because he sent his client out? Well, I think it comes from this twofold, Your Honor. I think Mr. Garrett testified leading up to this time. Well, if I can go back one point. The instance where we're talking about Mr. Garrett asking the lawyer for visae tenasia, was this a fraudulent loan? This was in 2008 at the very tail end. All the transactions, I think we had $86,000 that would have been out of however many millions, 6, 8, 10, or 12 million. At this point, only $86,000, I think it was $86,000, $87,000 worth of transfers happened after the time that this conversation took place. And Judge Mayer points that out in his opinion, that even if there was at that point that he started to think this could be fraudulent, everything had transpired before that. But also, Your Honor, the custom of the industry, not only did Mr. Garrett testify regarding everything that was going on in 2007, the industry climate, how everything was changing, but also, as you pointed out, Judge Mayer had several of these cases and actually I think he quotes himself, quotes his own opinions in this case, regarding part of what the industry custom on based on his own experience in this. I do think that it is correct that the court was familiar with the industry customs from a companion case that was tried only two weeks. I don't want to misquote the date or misstate the date. Maybe two weeks or a month before. So he was familiar with what was going on in the industry standard. Is that a proper basis, though, for a court to draw conclusions in another case, absent consent of the parties, to rely on a record in another case? Well, I don't know that it would be permissible, but, again, his opinion doesn't say that he's relying on that. I was just responding to what Judge, the question Judge Wynn asked, but, again, Your Honor, I think that it's, you know, the evidence is sufficient and also to the extent. What about the red flag they bring up on the shipper? They say he's on vacation. That's the response that the debtor gives. He's on vacation and just couldn't get it out. And the response, at least the evidence from Garrett is, well, that sounds reasonable, so they just accept it. That's all well and good from a subjective perspective, but where is the objective evidence that this is what, if that's what you hear in the industry, this is how the industry, the customary practice within the industry? Well, again, Your Honor, I think, you know, to say that that in and of itself is a red flag, when you're looking at the totality of the circumstances, everything that's going on in the industry, the entire industry is slow at this time. So, you know, I think I forget the date that when Mr. Garrett testified that we're at a point to where everybody's changed their policies and procedures, the market came back no bid, so nobody's actually buying loans, and if all your documentation isn't correct. So when he asked him, well, what's causing your delay? And he said, my shipper went on vacation. I mean, I don't know that, you know, other than the trier of fact, who is there to say that that isn't unreasonable, considering that, again, when you look at the entire industry at that time, the industry was, it's commonplace for this to be slow. Well, considering that the industry as a whole, everything's slow, and he says, well, I'm actually not suffering too bad from what's going on in the industry. My guy's just on vacation. I think when you put that together, that is definitely reasonable. You say, okay, well, he, you know, the industry is making everybody have problems, and fortunately for First Tennessee, his problems aren't as bad as everybody else's, despite the fact that there was a no bid. If his guy was in town, we make or get these loans off our books. So I think that's a positive more so than a negative or a red flag, Your Honor. Okay, so you're referring, then, to footnote 17. Is that what you're talking about in Judge Mayer's decision where he's citing Mr. Garrett, talking about the market coming back to no bid? Yes, ma'am. Okay. Yes, ma'am, Your Honor. I hadn't turned to footnote 17, but, yes, that's what I was talking about. But, again, Your Honor, we So essentially you're saying the industry was slow, and in that instance you simply can just accept it because it sounds reasonable and you don't, the customary practices would be you don't have anything to do to make an infer the inquiry, even though there's no testimony to that, but we can infer that. Well, I think, Your Honor, in and of itself, standing alone when you say my person's on vacation, I think we all, even in our law practices, if we go on vacation or one of our colleagues or one of our paralegals or somebody goes on vacation and we don't have the necessary staff in town today, we may not get something out as fast as when we're not talking, again, Your Honor, we're not talking a deadline such as I missed a deadline to get my appellate brief filed. We're just talking a deadline of we would like you to do this faster because in all these instances, First Tennessee always received the promissory note, which is the key document in a warehouse lending relationship is if I've got the promissory note in hand, you can be a little slow because that's what perfects my security interest. You give me everything else, but you don't give me a promissory note? I don't have a perfected security interest. What you collect is the note. You don't collect all the other documentation. So, again, in that instance, I've got you, your collateral, the key piece of evidence that you need in a case like this. They're getting you all this, but some of the supplemental documents, they may be a little bit slower of getting them. But, you know, again, Your Honor, I don't want to repeat myself, but in a slow marketplace and you say, hey, I may be stuck holding all these loans. Just a one-minute statement on how this fraud occurs. I mean, it's clear the debtor here was an absolute crook in the way this was done. I mean, all this is going on. We all kind of know that this guy was really a crook. The problem is now you've got the First Tennessee Bank, and they've got this $15 million or so. They're just letting him, helping him to do it, I guess, but not, as you say, not knowing. They're following the customary practices and stuff. Some of it involves using forged notes or notes that have been copied and non-original, and I'm having some difficulty following that. And maybe I have difficulty in the bankruptcy area, but in the real estate area where I did a lot of practice, banks never let me get away with that stuff. I never could, even as a closing lawyer. I just couldn't figure it out. How in the world do you keep sending back stuff to a bank? And then part of it is, well, the shipper was on vacation. We can't quite get this. Then you've got $12 million of loans you can't sell. All this is going on. And you send Mr. Daugherty enough concern to send Garrett and Daugherty in to start making questions in there, which I'm seeing their actions, which are quite reasonable subjectively, but it's the objective problem I'm beginning to have problems with because I'm having trouble to believe that this, that the customary practice would not give you some indication that there is a crook here and something wrong is happening in this industry rather than a slow, this is the way customers do it and things of that nature. I mean, that sounds like a real problem to me. Well, Your Honor, I would agree under certain circumstances, but when you look at the marketplace in 2007 when the whole bottom falls out. Everybody is doing it. Well, for the most part. That's the customary practice? At that time, sorry to cut you off, Your Honor. Is that the testimony? Everybody is doing it so we can do it this way? I mean, I didn't quite hear that either. Well, actually, Your Honor, at that time in 2007, out of the blue, when everybody's 401Ks went from $1 million down to $200,000 and everything else was going on, this was just unfortunately for all of us and for many people, this was kind of par for the course. And what I mean by that is we've got a $12, $15 million line, warehouse line, where we've got hundreds of millions of dollars of warehouse lines out there. We've got customers that have held warehouse lines with us, and this is testimony that's in the record. So I'm not making this up as I go. Well, the industry is set up so an absolute crook can do this because you go in and see he can dupe you into following all these things, bringing you high-level people, and he is really good because they don't have a clue. He is burning you good. And you don't have a clue, and burning all kinds of other people, and there's no customary practice over here, no testimony. Everything you've done is in line with the customary practice. Correct, Your Honor, because, again, Your Honor, you're talking a 90-day period. We're talking a new customer. We've done everything. We've talked to Regents Bank who refer him to us. We've done everything on the up and up. These were the initial draws on his line of credit. And, again, $15 million is a lot of money, but in the grand scheme of things for a warehouse lender that's got hundreds of millions of dollars out on the warehouse line. What is this case about? How much money are we talking about? In this case, I think it ended up being that they were trying to avoid about $3.2 million. Is that what this is about? About $3.2 million. And you tell me $15 million in the grand scheme of things is really not a whole lot. Why don't you give them back the $3 million then? No. I mean, if that's all this is about, if this is just a little bit of money, $15 million, you just told me is nothing. In a whole grand meeting. So how are they going to know this stuff? And you're here arguing about $3. Well, they're arguing about the $3. Just give it back. I mean, just give it back. Let everybody kind of have it. I mean, if that's the case, John, I think we're just saying everybody would be walking down the street giving. If you pay your mortgage on your house back, you own the house. I was following up on your de minimis, making this sound like it's a de minimis amount, the $15 million. And I said what we were sitting here arguing about is $3. And you tell me $15 was nothing. How are they going to know this stuff? Well, I was saying in the marketplace, in the grand, I wasn't saying specific to them. I'm saying in the grand marketplace, we're talking about the custom of the industry. And where I was headed, Your Honor, is that you've got customers that have been warehouse customers for 30 years, and this is, again, his testimony in the record. And they hadn't had slow pay or do anything. How did he do it? You got the $15 million. He's drawing from it. And he is to do what with that money he draws? He's to go out and get investors. No, no, never going to buy the mortgages. It was the same as if you or I were going to buy a house. Yes. We go to this mortgage company, and when he buys, when you go and obtain your loan, he draws the money down off the line of credit to pay, you know, the seller. And then we get the promissory note. It's sold to a secondary market purchaser within 90 days. That promissory note, so in order to be able to do that, what he does when he gives you something that looks like a promissory note, in some instances, is not really a note. Well, Your Honor, actually, in our record, there's nothing about any of that. There's no testimony that any of the notes were fraudulent in our case. We don't have anything about fraudulent promissory notes. So it's not a, I mean, I think Judge Mayer addresses that. Where is the fraud here? What's fraud? The fraud was, in other instances, in another warehouse lender, he had a fraudulent, he had, you know, had some fraudulent conduct, but this was not a fraudulent note. So what we had was fraudulent, we had some fraudulent deeds of trust. But wasn't he taking money from someone else and paying you? You know, actually, I think as Judge Mayer points out, Your Honor, that 90 percent of the money that he took, he never, from us, came from our loans. He drew, say, if he owed, the classic case of robbing Peter to pay Paul, but in this instance, you're just robbing Paul to pay Paul. But he was honest with you. He took our money and then paid it back to us. He didn't do anything wrong with you. Everything he did was above board and honest. Nothing was wrong on this. Well, no, something was wrong because he took money off the line to repay us. That's why we got left holding the bag. So it's take, you know, you owe me $50, so you take $50 off your line of credit to me and repay me with some of my same money. Of course, that's not right. Then our bottom line is just clearly the fact that you've got this line of credit, you are helping to enable him to carry on the scheme. So the issue here has to do is whether you had some knowledge or had some reason, should have known, and whether the customary practices would have alerted you to that. So it's not a question of whether or not you actually had the fraud or whatever. Your money is in this scheme. He couldn't do it without having Tennessee banks and others doing this with this line of credit. He wouldn't have had any money. Whether he was being honest with you or not is the fact that your money is being used to do these other things for people being bilked out of money. Well, he didn't use our money to bilk people. As you saw in Judge Mayer's opinion, he built a mansion for himself with our money, and he ran an entertainment company for our money. He didn't use our money to dupe others. I mean, that's clear from the record in the cases that he made movies and did different things with our money. So we didn't help him perpetrate a fraud on others, as you would see in some fraudulent schemes. So that's not what happened here. Your Honor, in the last couple of minutes, if I could, just for a minute, I would move back to, again, the issue here, though, is these things, the burdens here, or I guess to say your standards are reviewed. Was Judge Mayer clearly erroneous in his findings, I think is what the question is. And I think based on the record before us and the proof here, again, all we're here because we have a trustee that's asking the court to step in and say, I, Mr. Trustee, do not like Judge Mayer's conclusion. I don't have a ---- Is the issue in this case whether First Tennessee Bank carried its burden of establishing a good faith defense? I think that is the issue. But, again, I think the issue, though, is the trustee is trying to say that he doesn't approve of the evidence that Judge Mayer used to say that First Tennessee satisfied its burden. So he's saying substitute Judge Mayer's position for what the trustees believe. But, Your Honor, he hadn't put forth anything. He hadn't identified a single iota of evidence in the record or anything to say that the findings should be different. So, again, you can't just come in and say, I'm going to appeal it. Other than to say that there was no evidence of the objective standards. There's plenty of evidence of the subjective standards from Garrett and Doddick. But of the objective standards, the customary practice within the industry on certain of these things, he says that. I'm saying that's the position. But Judge Mayer, I think, I mean, the problem with his argument and his position, Your Honor, is he has to get around the fact that Judge Mayer lists, you know, various, you know, that he goes through and goes and says these are the customary practices of the industry. And he didn't pull them out of thin air. He got them wrote on paper, and he actually cites their evidence in the record. From where? From the testimony in the case. From whose testimony? From Mr. Garrett and Mr. Doddick. And, again, Your Honor, there's... Who are the employees of First Tennessee Bank? They are employees of First Tennessee Bank. But there's nothing that prevents the court from relying on the testimony from the employees of First Tennessee Bank. Is it a credibility? At best, it's a credibility issue. And I think Judge Mayer, he specifically addresses that. He took the time and went, you know, he didn't say he took the time, but, I mean, obviously this is, I think, you know, obviously First Tennessee, we think it's a real reason, a real thought-out opinion, and he took the necessary time to go through. And he addresses this would be a credibility issue. But looking at everything, he was satisfied with the fact that he gave that the proper weight, the fact that they're First Tennessee employees, he gave that the proper weight, Your Honor, and concluded that despite... Just so I have it in the proper context, are there cases in which it has been found that the good faith defense has been established where there was no expert in the case? Your Honor, I've read so many cases, I don't want to say, I can't quote one off the can... All I want is one of them, because I can't quite find one, but I want you to give me one. Well, other than what I can cite to is the district court and the bankruptcy court both stated that expert testimony wasn't required. And, again, at this point... That's an interesting cite, but that's not the case. Right. That doesn't help me out a whole lot. I'm just thinking, you know, and I think that, I'm not sure you want to say they're absolutely required, but it would seem to me that it's a pretty simple thing. I just don't understand why you didn't put an expert on and say, this is a customary practice and take care of that issue. I'm having some difficulty. And if it's not required, then at least something documentary or something other than I've been, my bank employee has been training and he's been to seminars and he understands these things. It's almost like an auditor could come in or someone else could come in who would be an... I could see how a bank might bring an independent investigator to come in and say this. Well, again, I think we were... I guess that's a strategic trial strategy issue, but we had a gentleman in Mr. Garrett who is, for all practical purposes, would, if someone else had a case, this is the gentleman you would call in to come and serve as your testifying expert in this case. I mean, for your case, if it was somebody else, he would serve as an expert for them. So when you have a circumstance like that and you don't have anything that says you have to have someone else labeled with the word expert, because that's all we don't have was the word expert by Mr. Garrett for our case. But otherwise, he is an industry expert, and I think he testified. He wasn't qualified as such. You clearly said he's not an expert. Well, I think we didn't move to qualify him as one. We didn't move to qualify him as an expert because it wasn't required. But otherwise, I think his qualifications and everything else, as Judge Mayer points out, would allow him to serve as an expert in a case of this nature. Thank you. Thank you, sir. Roberto? Roberto? Just to address a couple of points raised by Judge Wynn with respect to the circumstances of this shipper as to whether you needed industry standards or some evidence of that. The facts in the record are that this shipper went off on vacation in September, and this meeting was in November. So you have a context of some five- or six-week span. And this is not a – there's interest running on $12 million worth of loans, so it's not something that you would casually accept as a reasonable action by someone in Tunisia's position. So to simply say the market explained it all, that doesn't meet the standards as to what a reasonably prudent lender would do when faced with those circumstances of not being able to sell $12 million worth of loans. And also to suggest that Tunisia wasn't part of the fraudulent scheme, that he was honest with them, is also not – is contrary to the record. The statement of facts that was admitted in Exhibit 52 specifically talks about First Tennessee. They were involved in the case. And there's also evidence in the record, and it was found by Judge Mayer in his opinion even, that there was a bank after – Franklin Bank, who was a warehouse lender, after First Tennessee Bank also – they used that money. So it wasn't simply First Tennessee's money coming back to pay First Tennessee. It was Franklin Bank's money as well, part of this broad scheme. So First Tennessee's participation was an essential part of the scheme. And simply to say that market conditions in 2007 explain everything is – you could also make easily the same argument that in 2007, when there's a lot of pressure on mortgage bankers and mortgage lenders, that that's when you have to be extra careful to make sure that they're not cheating you and they're not doing what he did in this case, which is to create phony loans and phony mortgages, that you do the investigation and follow up. But you would need somebody to testify about that from the industry, saying this is what someone would do in a circumstance in 2007 when the market is in turmoil. What do you do when you have these indications of red flags? Not delivering the notes on time, not selling the loans, notes being kicked back. And then all of a sudden in the first week of the end of November, beginning of December 2007, he sends you $2.5 million of loans from his corporate funds. Now, Mr. Garrett and Mr. Dowry testified they didn't believe that that was an issue, but you needed to have some evidence of what the industry standard was in order to determine whether their actions were in compliance, whether they were not on inquiry notice and then required to do some follow-up. And I think there's just simply no evidence of that in the record. The second aspect of this case, which we haven't really touched on, is the finding of the bankruptcy court that this was not a Ponzi scheme. And obviously the 548C issue is the controlling issue in the case, and so you don't get to the Ponzi scheme question until you decide with the 548C issue. And it's appropriate that we discuss that. But you aren't rebutting anything at this point. I mean, is it fair for you to raise the Ponzi scheme when Mr. Wilbin won't have a chance to address that in this court? That's true. It's adequately addressed in the briefs, and I don't think I'd have to address that specifically. I think the arguments in the case law are as clear as to how that's applied, so I don't have to go into a long discussion of it. He never did talk about it. But, I mean, the bottom line, again, Mr. Garrett, when you talk about the pretrial order required, anyone who's going to testify as an expert to be designated in the pretrial thing, so you can't simply come into trial and say, Mr. Garrett's very well qualified, we want to use him as an expert. No, you have to tell us back in December 1st that we intend to use Mr. Garrett as an expert. Of course, that would have been impossible because the expert depositions and everything else had expired. So that's kind of a frivolous point to make. But nothing that Mr. Wilbon said about what their customers were doing, why their customers were having problems, that they had a lot of other customers who were doing this, all relates strictly to First Tennessee's practices and First Tennessee's customers. There's nothing that goes beyond proving what other warehouse lending banks were. There was no testimony with regard to whether they had a fraud procedure to detect fraud. In fact, the only testimony in the record is that they did not have any manuals or procedures, which is contrary to what I've seen in other cases. So they have not established their burden under 548C, and therefore we believe the court should reverse the bankruptcy court's decision and the district court's decision and award judgment to the trustee because the Ponte scheme presumption was unrebutted, and we were entitled to it as a matter of law. Thank you, Your Honor. All right, sir. Thank you very much. We'll come down to Greek Council, and then we'll take a brief recess. This honorable court will take a brief recess.
judges: Barbara Milano Keenan, James A. Wynn, Jr., Stephanie D. Thacker